IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | 8:10CR225 |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | MEMORANDUM AND ORDER |
| MARCEL EDWARD PARKS, ) | |
| ) | |
| Defendant. ) | |

This matter is before the court on the defendant's motion to strike surplusage from the Indictment, Filing No. 36.

I.  BACKGROUND

The defendant was indicted on June 23, 2010, for possession with intent to distribute more than 50 grams of a mixture or substance containing a detectable amount of cocaine base ("crack cocaine").  Filing No. 1.  The defendant asks that the reference to quantity be stricken, contending that the quantity reference is superfluous and irrelevant in light of the enactment of the Fair Sentencing Act ("the Act"), Pub. L. No. 111-220, 124 Stat. 2372 (Aug. 3, 2010).

The government opposes the defendant's motion.  It contends that the Fair Sentencing Act does not apply to the defendant's offense because 1 U.S.C. § 109 (the so-called "savings clause") requires a court to apply the criminal statute in effect at the time of the defendant's offense, unless Congress expressly provides otherwise.[1]  The

---

[1]The savings clause provides:

The repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of

government argues that the quantity allegation remains relevant since the harsher penalties set out in the statute as it existed at the time of the offense apply to the defendant's case. The government has indicated in this and other cases that it takes the position that a defendant charged with, but not yet convicted of or sentenced for, a crack cocaine offense is subject to the mandatory minimum and maximum sentences in force at the time he committed the crime, that is, the pre-amendment statute that applied a 100 to 1 ratio of penalties between crack and powder cocaine.

The question before the court is whether defendants who were charged prior to the Fair Sentencing Act's effective date, but who have not been convicted or sentenced (i.e., cases in the pipeline), should receive the benefit of the lower penalties provided in the Act. For the reasons discussed below, the court finds the Fair Sentencing Act is applicable to the defendant's offense. Accordingly, the court finds that the reference in the indictment to a quantity of over 50 grams of crack cocaine is irrelevant and should be stricken.

II. DISCUSSION

References in an indictment to sentence enhancement factors "are 'mere surplusage' and 'may be disregarded if the remaining allegations are sufficient to charge a crime.'" *United States v. Bates*, 77 F.3d 1101, 1105 (8th Cir. 1996) (quoting *United States v. Washington*, 992 F.2d 785, 787 (8th Cir. 1993). Facts that alter the maximum penalty function as traditional elements of a crime. See *Harris v. United States*, 536 U.S. 545, 560-61 (2002); *United States v. Turner*, 603 F.3d 468, 471 (8th Cir. 2010) (drug

---

sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability.

1 U.S.C. § 109.

2

quantity is an element of the offense when it increases the relevant maximum punishment). The government has a constitutional obligation to charge each element in the indictment, submit each element to the jury, and prove each element beyond a reasonable doubt. *Harris*, 536 U.S. at 557; *see also Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000).

The statute that criminalizes drug possession and distribution, 21 U.S.C. § 841, is structured to provide three tiers of punishment, depending on the drug quantity involved in the offense. *See* 21 U.S.C. § 841 (b) (1) (A)(iii) (10 years to life); § 841(b)(1)(B) (iii) (5 to 40 years); 21 U.S.C. § 841(b)(1)(C) (no minimum and a maximum sentence of 20 years for the prohibited acts regardless of quantity). The Fair Sentencing Act increased the quantity of crack cocaine that triggers a sentence of 5 to 40 years from 5 grams to 28 grams[2] and the quantity that triggers a sentence of 10 years to life from 50 grams to 280 grams.[3] *Compare* 21 U.S.C. § 841(b)(1)(B)(iii) (2008) *with* 21 U.S.C. § 841(b)(1)(B)(iii) (2010). The Act also eliminated the five-year mandatory minimum sentence for simple possession of crack. 21 U.S.C. § 844(a) (2010). The Act increases some penalties as well. *See, e.g.*, Fair Sentencing Act, Pub. L. 111-220, § 4, 124 Stat. 2372, 2372 (codified at 21 U.S.C. § 841(B)(1)(b) (2010)) (increasing fines); § 5, 124 Stat. 2372, 2372-73

---

[2]Congress selected 28 grams as the trigger for the five-year mandatory minimum because the Sentencing Commission and other experts have concluded that less than one ounce is a retail/user-level quantity, while more than one ounce is the quantity sold by wholesalers. *See* Public Comment Letters Received by the United States Sentencing Commission in Response to Request for Public Comment on Proposed Amendment and Issues for Comment (Fair Sentencing Act of 2010), 75 Fed. Reg. 54700 (October 2010), correspondence from Sen. Richard to Hon. William Sessions dated Oct. 8, 2010 (available at http://www.ussc.gov/pubcom_20101014/pc20101014.htm).

[3]The evidence adduced at a hearing on the defendant's motion to suppress indicates that the quantity of crack cocaine attributable to the defendant is approximately 60 grams of crack cocaine. *See* Filing No. 33, Transcript at 15, 41. For a defendant, like this one, whose offense involves more than 50 grams, but less than 280 grams of crack cocaine, the Fair Sentencing Act would reduce the statutory maximum for his crime from life to 40 years.

(directing the Sentencing Commission amend the Guidelines to add a two-level Guideline increase if a defendant used, threatened or directed use of violence) (codified at 28 U.S.C. § 994 (2010); § 6, 124 Stat. 2372, 2373 (directing the Commission to provide a two-level increase for a variety of circumstances including bribery and "super-aggravating factors"). Additionally, Congress provided emergency authority to the Sentencing Commission to promulgate the Guidelines, policy statements, or amendments provided for in the Act and "to make such conforming amendments to the Federal sentencing guidelines as the Commission determines necessary to achieve consistency with other guideline provisions and applicable law" as "soon as practicable, and in any event not later than 90 days after the date of enactment of this Act." *Id.,* § 8, 124 Stat. 2372, 2374.

The Sentencing Commission issued temporary emergency amendments effective November 1, 2010. *See* Notice of a Temporary Emergency Amendment to Sentencing Guidelines and Commentary, 75 Fed. Reg. 66188-02, 66191, 2010 WL 4218801 (F.R.) (Oct. 27, 2010) (noting that to account for statutory changes, "the amendment conforms the guideline penalty structure for crack cocaine offenses to the approach followed for other drugs, i.e., the base offense levels for crack cocaine are set in the Drug Quantity so that the statutory minimum penalties correspond to levels 26 and 32," and other offenses levels are established by extrapolating upward and downward). The Commission noted that "[c]onforming to this approach ensures that the relationship between the statutory penalties for crack cocaine offenses and the statutory penalties for offenses involving other drugs is consistently and proportionally reflected throughout the Drug Quantity Table." *Id.*

4

Under Congress's criminal sentencing statutory scheme, the Sentencing Guidelines that govern a defendant's sentence are generally those in effect at the time of the sentencing. 18 U.S.C. § 3553(a)(4)(A)(ii); *see also* U.S.S.G. § 1B1.11, p.s. The Sentencing Commission is authorized under sentencing statutes to decide whether to amend the Guidelines, and to determine whether and to what extent an amendment will be retroactive. *See* 28 U.S.C. § 994 (o) & (u); *Dillon v. United States,* 130 S. Ct. 2683, 2688 (June 17, 2010). The Commission had amended the Guidelines for crack offenses in 2007, but had no authority to modify sentences imposed under the mandatory minimum statutes. *See* Notice of Submission to Congress of Amendments to the Sentencing Guidelines effective November 1, 2007, 72 Fed. Reg. 28558-01, 2007 WL 1459813 28 (May 21, 2007); *U.S. Sentencing Commission Votes to Amend Guidelines for Terrorism, Sex Offenses, Intellectual Property Offenses, and Crack Cocaine Offenses* (April 27, 2007) (available at http://www.ussc.gov/PRESS/rel0407.htm) (emphasizing the commission's strong view that the amendment was only a partial solution to problems associated with the 100 -to-1 drug quantity ratio and that "[a]ny comprehensive solution to the 100-to-1 drug quantity ratio would require appropriate legislative action by Congress"). The Commission later voted unanimously to give those Guidelines amendments retroactive effect, noting that it "made its decision on retroactivity of the crack cocaine amendment after months of deliberation and years of examining cocaine sentencing issues" including over 33,000 letters or written comments and a full-day hearing. *U.S. Sentencing Commission Votes Unanimously to Apply Amendment Retroactively for Crack Cocaine Offenses* (Dec. 11, 2007) (available at http://www.ussc.gov/Legislative_ and_Public_Affairs/Newsroom/Press_ Releases/20071211_Press_Release.htm.

5

Congress's stated goal in enacting the Fair Sentencing Act was "to restore fairness to Federal cocaine sentencing."  Preamble, Fair Sentencing Act of 2010, Pub. L. 111-220, 124 Stat. 2372 (Aug. 3, 2010).  The passage of the Fair Sentencing Act was the culmination of over 15 years of discussion and policy debate over the harsh crack penalties in the Anti-Drug Abuse Act of 1986.  *See* David Yellen, *The Sentencing Commission Takes on Crack, Again*, 20 Fed. Sent. R. 227, 227, 2008 WL 4489732, \*\*2 (April 2008).  The Sentencing Commission had repeatedly urged Congress to reform crack penalties because they did not effectively comport with the purposes of sentencing and failed to reflect the relative culpability of drug offenders.  *See, e.g.*, United States Sentencing Commission, Report to Congress: Cocaine and Federal Sentencing Policy (May 2007) ("2007 Report"); United States Sentencing Commission, Report to Congress: Cocaine and Federal Sentencing Policy (May 2002) ("2002 Report"); United States Sentencing Commission, Special Report to Congress: Cocaine and Federal Sentencing Policy (Apr. 1997) ("1997 Report"); United States Sentencing Commission, Special Report to Congress: Cocaine and Federal Sentencing Policy (Feb. 1995) ("1995 Report").  The Supreme Court acknowledges that "the crack/powder disparity produces disproportionately harsh sanctions, i.e., sentences for crack cocaine offenses 'greater than necessary' in light of the purposes of sentencing set forth in § 3553(a)." *Kimbrough v. United States,* 552 U.S. 85, 110; *see also* *Spears v. United States,* 129 S. Ct. 840, 843 (2009) (per curiam) (clarifying that "district courts are entitled to reject and vary categorically from the crack-cocaine Guidelines based on a policy disagreement with those Guidelines").

The Fair Sentencing Act was enacted because it had become clear that there was no evidentiary basis for the 100-to-1 crack/powder ratio and to remedy the racially

discriminatory impact of the ratio.  *See, e.g.,* 155 Cong. Rec. S10488-01, S10491, 2009 WL 3319524 (daily ed. Oct. 15, 2009) (statement of Sen. Durbin noting that "the crack/powder disparity disproportionately affects African Americans" and stating "[w]e now know the assumptions that led us to create this disparity were wrong."); *id.* at *S10492 (statement of Sen. Patrick Leahy that "the criminal justice system has unfair and biased cocaine penalties that undermine the Constitution's promise of equal treatment for all Americans"); *id.* (statement of Sen. Jeff Sessions that "the current system is not fair" and "we are not able to defend the sentences that are required to be imposed under the law today"); 156 Cong. Rec. H6196-01, *H6198, 2010 WL 2942883 (daily ed. July 28, 2010) (statement of Rep. James E. Clyburn that the 100 to 1 ratio was "unjust and contrary to our fundamental principles of equal protection under the law"); *H6199 (statement of Rep. Jackson Lee that "[t]his disparity made no sense when it was initially enacted, and makes absolutely no sense today," and acknowledging that "the current 100 to 1 penalty structure undermines various congressional objectives set forth in the Anti-Drug Abuse Act of 1986" in targeting Federal resources at low-level crack cocaine users and dealers); *H6200 (finding that "[m]ost of the assumptions on which the current penalty structure was based have turned out to be unfounded"); *H6202 (statement of Rep. Daniel Lungren that "[w]e didn't really have an evidentiary basis for [the 100 to 1 ratio]"); *H6202 (statement of Rep. Bobby Scott that "there is no justification for the 100-to-1 ratio").  Another key rationale for the Act was to ensure that minor crack offenders would not be punished more severely than major cocaine dealers.  *See* News Release, Office of Senator Jeff Sessions, *Congress Approves Landmark Drug Reform Compromise from Sessions and Judiciary Colleagues* (July 28, 2010) (available at http://sessions.senate.gov/public/index.cfm?

FuseAction=PressShop.NewsReleases&ContentRecordid=1a65bdfb-e4b4-53dl-f86c-e845c43ff542) (stating "the disparity between crack and powder cocaine sentencing has now been significantly reduced to better and more strategically target federal resources at those who distribute wholesale quantities of narcotics").  Notably, a bill that would have specifically provided that it would not take effect for 180 days and would have had no retroactive application was earlier rejected.  *See* H.R. 4545, 110th Cong. (1st sess. 2007).

Recently, Senators Richard Durbin and Patrick Leahy clarified Congress's intentions in a letter to United States Attorney General Eric Holder dated Nov. 17, 2010 (available at http://sentencing.typepad.com/sentencing_law_and_policy/2010/11/senators-leahy-and-durbin-write-letter-to-attorney-general-holder-urging-application-of-fsa-to-pendi.html). Senators Durbin and Leahy acknowledge the "sense of urgency" that motivated the directive for the commission to promulgate emergency amendments, noting that "[e]very day that passes without taking action to solve this problem is another day that people are being sentenced under a law that virtually everyone agrees is unjust."  *Id.* at 1.  The Senators state that they are "disturbed" by the DOJ position that the Fair Sentencing Act does not apply to defendants in cases pending at the time of the enactment, and characterize the result of the position as "absurd" and "obviously inconsistent with the purpose of the Fair Sentencing Act."  *Id.*  They urge the Attorney General "to seek sentences consistent with the Fair Sentencing Act" as a matter of prosecutorial discretion. *Id.*

Before the Fair Sentencing Act was passed, the Department of Justice ("DOJ" or "the Department") recognized "the mounting evidence that the current cocaine sentencing disparity is difficult to justify based on the facts and science," and advocated  completely

eliminating the sentencing disparity between crack and powder cocaine. *Restoring Fairness to Federal Sentencing: Addressing the Crack-Powder Disparity: Hearing before the S. Judiciary Comm., Subcomm. on Crime and Drugs,* 11th Cong. 9-10 (April 29, 2009) (statement of Lanny A. Breuer, Assistant Attorney General, Criminal Division) (available at sentencing.typepad.com/ sentencing_law_ and_policy/2009/04/dojs-basic-gameplan-while-urging-crack-sentencing-reform-from-congress.html or http://judiciary.senate.gov/hearings/testimony.cfm?id=3798&wit_id=7836). The DOJ called for reassessment of the federal cocaine sentencing policy in light of evolving understanding of the effects of crack and powder cocaine and the need to ensure fundamental fairness in sentencing laws. *Id.* at 3. It stated that "[until a comprehensive solution—one that embodies new quantity thresholds and perhaps new sentencing enhancements—can be developed and enacted as legislation by Congress and as amended guidelines by the Sentencing Commission, federal prosecutors will adhere to existing law," but, recognizing that "federal courts have the authority to sentence outside the guidelines in crack cases or even to create their own quantity ratio in upcoming cases, . . . [o]ur prosecutors will inform courts that they should act within their discretion to fashion a sentence that is consistent with the objectives of 18 U.S.C. § 3553(a)." *Id.*

United States Attorney General Eric Holder stated in public remarks that "[i]t is the view of this Administration that the 100-to-1 crack-powder sentencing ratio is simply wrong. It is plainly unjust to hand down wildly disparate prison sentences for materially similar crimes. It is unjust to have a sentencing disparity that disproportionately and illogically affects some racial groups." Attorney General Eric Holder, Remarks as Prepared for Delivery by Attorney General Eric Holder at the D.C. Court of Appeals Judicial Conference

(June 19, 2009) (available at www.usdoj.gov/ag/speeches/2009/ag-speech-090619.html.) The Attorney General later stated that "[t]here is no law enforcement or sentencing rationale for the current disparity between crack and cocaine powder offenses, and I have strongly supported eliminating it to ensure our sentencing laws are tough, predictable and fair," noting that he looked forward to "the Senate and the House approving this legislation quickly so that it can be signed into law." Statement of the Attorney General on Senate Judiciary Committee's Approval of the Fair Sentencing Act (March 11, 2010) (available at http://www.justice.gov/ag/speeches/2010/ag-speech-100311.html). Earlier, Holder had testified before the Senate Judiciary Committee that "[t]he stakes are simply too high to let reform in this area wait any longer." *Oversight of the Department of Justice: Hearing Before the S. Judiciary Comm.,* 111th Cong 10 (November 18, 2009) (statement of Attorney General Eric Holder)(available at http://www.justice.gov/ag/testimony/2009/ag-testimony-0911181.html or http://judiciary.senate.gov/hearings/testimony.cfm?id= 4172& wit_id=8318)

      The Constitution's *ex post facto* clause "forbids the application of any law or rule that increases punishment to preexisting criminal conduct." U.S. Const. Art. 1, § 9, cl. 3. "To fall within the *ex post facto* prohibition, a law must be retrospective—that is, 'it must apply to events occurring before its enactment'—and it 'must disadvantage the offender affected by it,' by altering the definition of criminal conduct or increasing the punishment of the crime." *Lynce v. Mathis*, 519 U.S. 433, 441 (1997) (quoting *Weaver v. Graham*, 450 U.S. 24, 29 (1981)). Accordingly, the Fair Sentencing Act cannot be applied if it results in a harsher penalty for someone who had already committed the crime. *See United States v. Bell*, 991 F.2d 1445, 1452 (8th Cir. 1993). Because an amendment to a Sentencing

Guideline has the potential to increase a defendant's punishment for a crime committed prior to the amendment, the *ex post facto* clause is violated if a defendant is sentenced under the Guidelines in effect at the time of sentencing when those Guidelines produce a sentence harsher than one permitted under the Guidelines in effect at the time the crime is committed." *Id.*

When the Supreme Court announces new rules of substantive or procedural law, those rules apply to all cases that are not yet final. *Griffith v. Kentucky*, 479 U.S. 314 (1987). A conviction does not become final until the expiration of direct review. *See Kapral v. United States*, 166 F.3d 565, 577 (3d Cir. 1999). This rule of retroactivity has "constitutional underpinnings." *Danforth v. Minnesota*, 552 U.S. 264, 278 n.15 (2008). One rationale for the rule is the actual inequity of violating the principle of treating similarly situated defendants the same. *Griffith*, 479 U.S. at 323.

The general savings statute was enacted "to abolish the common-law presumption that the repeal of a criminal statute resulted in the abatement of 'all prosecutions which had not reached final disposition in the highest court authorized to review them.'" *Bradley v. United States*, 410 U.S. 605, 607 (1973); *Warden, Lewisburg Penitentiary v. Marrero*, 417 U.S. 653, 660 (1974) (noting that Congress enacted the savings statute to avoid abatements that were "often the product of legislative inadvertence"). The savings clause supplies a general rule of statutory construction that prescribes the effect of a repealing statute on an existing penalty in the absence of congressional intent to the contrary. *Great Northern Ry. Co. v. United States*, 208 U.S. 452, 465 (1908) (emphasis added); *Martin v. United States*, 989 F.2d 271, 276 (8th Cir. 1993) ("Just as the rule of construction is inapplicable when Congress expressly intends a repeal to have immediate effect, we

11

believe that resort to this rule of construction may be unnecessary when Congress specifically provides that a statutory repeal will have purely prospective effect"). However, the savings statute need not be enforced if, "either by express declaration or necessary implication arising from the terms of the law as a whole, it results that the legislative mind will be set at naught by giving effect to the [saving statute]." *Great Northern Ry. Co,* 208 U.S. at 465. The provision is to be interpreted, read, and construed "in order to give effect to the will and intent of Congress." *Hertz v. Woodman,* 218 U.S. 205, 217 (1910).

Even with statutory language that is "clearly delineated," exceptions may be implied "where essential to prevent 'absurd results' or consequences obviously at a variance with the policy of the enactment as a whole"). *United States v. Rutherford,* 442 U.S. 544, 552 (1979). The Supreme Court imputes to Congress "an intention to avoid inflicting punishment at a time when it can no longer further any legislative purpose, and would be unnecessarily vindictive." *Hamm v. City of Rock Hill,* 379 U.S. 306, 308 (1965); *United States v. Chambers,* 291 U.S. 217, 222-23 (1934); *Massey v. United States,* 291 U.S. 608 (1934); *see also United States v. Mechem,* 509 F.2d 1193, 1196 (10th Cir. 1975) (finding that the stated purpose of congressional enactment to avoid prosecution of juveniles as criminals and the enactment's recognition of a need for "immediate and comprehensive action," furnished the basis for the conclusion that "Congress did not intend the ordinary criminal process to continue, through the saving statute, to reach juveniles not yet tried.")

Congress's intent to apply a statute to pending cases does not have to be expressed in explicit language of the statute itself, but may be revealed by studying the context of the statute as a whole. *See Lindh v. Murphy,* 521 U.S. 320, 326 (1997); *see also Abbott v. United States,* — U.S. —, 131 S. Ct. 18 (finding strong contextual support for its

12

interpretation of a statutory provision and stressing that a contrary reading "would result in sentencing anomalies Congress surely did not intend").

Where there is ambiguity in a criminal statute, doubts are resolved in favor of the defendant. *United States v. Bass*, 404 U.S. 336, 348 (1971). Statutory interpretative principles should "give the rule of lenity special force in the context of mandatory minimum provisions," because an interpretive error on the side of leniency still permits the sentencing judge to impose a sentence that will serve all other sentencing goals set forth by Congress in other statutory provisions. *Dean v. U.S.*, 129 S. Ct. 1849, 1860-61 (2009) (Breyer, J., concurring).

### III. ANALYSIS

The court first finds that the government's reliance on the savings clause is misplaced. That statute applies only in the absence of an expression of congressional intent. The court finds it clear in the text and structure of the Fair Sentencing Act, as part of other congressional enactments that establish the overall federal sentencing scheme, that Congress intended the Act to apply to cases pending at the time of the enactment. This intention is expressed in its directive to the Sentencing Commission to promulgate emergency amendments conforming Guidelines penalties to the new statutory crack penalties. The directive to the Commission was issued to ensure consistency in sentencing. The Commission had sought such emergency authority in its 2007 report, in order to "enable the Commission to minimize the lag between any statutory and guideline modifications for cocaine offenders." *See* 2007 Report at 9. The "consistency" that Congress sought to achieve by way of the directive is the match between the statutory sentences and Guidelines sentences for crack offenses. Congress was, of course, aware

of the statutory provision that requires that defendants be sentenced under the Guidelines in effect at the time of their sentencing.  The grant of emergency amendment authority to the Commission means that Congress intended and expected that the new crack penalties would be applied as soon as possible.  The expressed goal of consistency is evidence that the underlying intent was that the lower penalties provided in the Fair Sentencing Act would apply to pending cases just as the amended Guidelines would be applied to pending cases.  The directive is an indication that Congress contemplated and considered the interplay between the Guidelines and the Fair Sentencing Act and anticipated congruence between them.  To find otherwise would defy logic.

The statute of limitations for drug distribution offenses is five years.  See 18 U.S.C. § 3282(a).  Under the government's interpretation, a court would be required to impose sentences that are universally regarded as unfair and discriminatory, to all crack crimes committed in the five years prior to August 3, 2010.  Given the prevalence of lengthy and ongoing drug conspiracies, it is not far-fetched that there would be a number of such prosecutions. That result surely unsupportable. Adopting the government's position would set up a two-tired system of sentencing wholly at odds with the simplicity of the Guidelines provision requiring that the Guidelines in effect at the time of sentencing apply.

Application of the savings clause under these circumstances would have the result of setting the legislative mind "at naught."  The savings clause is not to be applied in circumstances that lead to an absurd result.  To continue to sentence defendants under a formula that is uniformly regarded as unfair and unjust is such an absurd result.  It would frustrate the expressed congressional goals of remedying racially discriminatory impact,

14

ensuring that more culpable offenders are punished more harshly, and achieving consistency with the Guidelines.

The government's argument blurs the distinction between a defendant who has already been sentenced and those defendants, like this one, who have yet to be sentenced, or even convicted. Concerns about judicial economy and the finality of judgments could justify some limitations on reopening or relitigating sentences with respect to the former, but such concerns have no application where there is nothing to relitigate or reopen. Judicial economy would be better served with a simple, straightforward rule that the Fair Sentencing Act applies to their pending cases, just as the Guidelines in effect at the time of sentencing apply.

The provisions of the Fair Sentencing Act that disadvantage an offender cannot be applied because of *ex post facto* concerns. Judicial economy is not served by a piecemeal ad hoc application of the Act's provisions. The government has not identified any valid congressional interest that would be served by continuing to apply the now discredited and repudiated 100-to-1 ratio to those defendants who would now be categorized as minor crack offenders.

The legislative history of the Fair Sentencing Act bolsters the court's conclusion. Devining congressional intent in these circumstances is not an arcane inquiry into antiquated archives. The congressional hearings and debate on this issue are recent, accessible and voluminous. Members of Congress clearly elucidated their positions in public statements. Recent legal developments and changes in the sentencing climate are well known to the court and the criminal bar. The crack penalty reforms did not occur in a vacuum. It would be illogical to ignore Congress's stated and implied objectives in order

to exalt a hypertechnical interpretation of an antiquated statute. To do so would also diminish the effectiveness of the remedial advisory Guidelines scheme as envisioned by the Supreme Court.

Moreover, even if congressional intent were unclear, both the rule of lenity and the constitutional avoidance canon of statutory construction call for the Fair Sentencing Act to be applied to cases pending at the time of its enactment. Application of the Fair Sentencing Act to cases in the pipeline will also avoid a potential constitutional issue. Applying the discredited 100-to-1 ratio to defendants who committed an offense before August 3, 2010, but who have not yet been convicted has both constitutional implications. The defendant argues that the equal protection and cruel and unusual punishment concerns are involved. Arguably, the Equal Protection Clause may be implicated, both because the harsh penalties have disparate racial effects and because the clause could be violated by treating offenders differently. Similarly, the Eighth Amendment may be implicated because the severity of the punishment is out of proportion to the culpability of a defendant who committed the crime prior to August 3, 1020, vis-a-vis one who committed the same crime after that date. However, the court is more concerned that the continued application of a criminal penalty that fails to serve any legitimate governmental objective would be so arbitrary and irrational that it would violate a defendant's right to due process. Also, because a defendant's maximum sentence, as well as a mandatory minimum sentence is affected under the Act, the due process concerns addressed in *Apprendi, Blakely* and *Booker* are also potentially implicated.

Further, the government's present position is at odds with its professions to Congress and the public. The Department of Justice has publicly acknowledged that the


pre-FSA penalties for crack cocaine are overly harsh, discriminatory, and unfair. To now call for their continued application is inconsistent at best and hypocritical at worst. The Department of Justice's present position is in irreconcilable conflict with its earlier statements.

Accordingly, because the defendant is subject to the Fair Sentencing Act of 2010, the quantity reference in the indictment is surplusage and should be stricken.[4]  Accordingly.

IT IS ORDERED:

1. The defendant's motion to strike, Filing No. 36, is granted.

2. The quantity of cocaine base is stricken.

DATED this 28th day of December, 2010.

BY THE COURT:

s/ Joseph F. Bataillon
Chief District Court Judge

---

[4] The reference to "over 50 grams" is no longer relevant to the charge under 21 U.S.C. § 841(b)(1)(A)(iii) (which triggers a 10 years to life sentence for distribution of over 280 grams of crack), but may be relevant to a charge under 21 U.S.C. § 841(b)(1)(B)(iii) that provides a 5-to-40 year sentence for distribution of over 28 grams of crack.

[*] This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.